UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| ERNESTO ARIOLA, | ) | NO. CV 09-333-CT |
| | ) | |
| Plaintiff, | ) | OPINION AND ORDER |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

For the reasons set forth below, it is ordered that judgment be entered in favor of defendant Commissioner of Social Security ("the Commissioner") because the Commissioner's decision is supported by substantial evidence and is free from material legal error.

### SUMMARY OF PROCEEDINGS

On January 21, 2009, Ernesto Ariola ("plaintiff") filed a complaint seeking judicial review of the denial of benefits by the Commissioner pursuant to the Social Security Act ("the Act"). The parties consented to proceed before the magistrate judge. On May 7, 2009, plaintiff filed a brief with points and authorities in support of remand or reversal. On June 5, 2009, the Commissioner filed a brief in support of

1  defendant's answer and in opposition to plaintiff's memorandum of points

2  and authorities.

3  ## SUMMARY OF ADMINISTRATIVE RECORD

4  1.   Proceedings

5  On October 27, 2005, plaintiff filed applications for disability

6  insurance benefits and Supplemental Security Income ("SSI").   (TR 122-

7  131.)[1]  He alleged disability since November 19, 2004, due to back pain,

8  bursitis, arthritis, heart problems, and diabetes.    (TR 142.)    The

9  applications were denied initially and upon reconsideration.   (TR 76-

10  98.)

11  On January 11, 2007, plaintiff filed a request for a hearing before

12  an administrative law judge ("ALJ").   (TR 99.)   On November 16, 2007,

13  plaintiff, represented by an attorney, appeared and testified before an

14  ALJ.   (TR 41-62.)    The ALJ also considered vocational expert ("VE")

15  testimony. (TR 62-70.)

16  Following the hearing, the record was left open for 30 days for

17  plaintiff to submit additional medical evidence.   (TR 70.)   He submitted

18  additional records on December 7, 2007.   (See TR 367-429.)

19  On February 11, 2008, the ALJ issued a decision that plaintiff was

20  not disabled, as defined by the Act, and thus was not eligible for

21  benefits because, while his physical limitations now preclude him from

22  doing his past relevant work of machinist and blind and drapery

23  installer, jobs nonetheless exist in significant numbers in the regional

24  and national economy that he can perform. (TR 23.)

25

26  [1]    "TR" refers to the transcript of the record of
administrative proceedings in this case and will be followed by
27  the relevant page number(s) of the transcript.

28

1    On February 18, 2008, plaintiff filed a request with the Social

2  Security Appeals Council to review the ALJ's decision.  (TR 8-9.)  On

3  November 12, 2008, the request was denied.  (TR 3-6.)  Accordingly, the

4  ALJ's decision stands as the final decision of the Commissioner.

5    Plaintiff subsequently sought judicial review in this court.

6         2.   Summary Of The Evidence

7    The ALJ's decision is attached as an exhibit to this opinion and

8  order and, except as set forth below, materially summarizes the evidence

9  in the case.

10                        **PLAINTIFF'S CONTENTIONS**

11    Plaintiff contends the psychometric findings of a consultative

12  psychological examiner support borderline intellectual functioning and

13  preclude the positions found by the ALJ.

14                        **STANDARD OF REVIEW**

15    Under 42 U.S.C. § 405 (g), this court reviews the Commissioner's

16  decision to determine if: (1) the Commissioner's findings are supported

17  by substantial evidence; and, (2) the Commissioner used proper legal

18  standards.  Macri v. Chater, 93 F.3d 540, 543 (9th Cir. 1996).

19  Substantial evidence means "more than a mere scintilla," Richardson v.

20  Perales, 402 U.S. 389, 401 (1971), but less than a preponderance.

21  Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir. 1997).

22    When the evidence can reasonably support either affirming or

23  reversing the Commissioner's conclusion, however, the Court may not

24  substitute its judgment for that of the Commissioner.  Flaten v. Sec'y

25  of Health and Human Servs, 44 F.3d 1453, 1457 (9th Cir. 1995).  T h e

26  court has the authority to affirm, modify, or reverse the Commissioner's

27  decision "with or without remanding the cause for rehearing."  42 U.S.C.

28

                                   3

1  § 405 (g).

2                              **DISCUSSION**

3        1.   The Sequential Evaluation

4        A person is "disabled" for the purpose of receiving social security

5  benefits if he or she is unable to "engage in any substantial gainful

6  activity by reason of any medically determinable physical or mental

7  impairment which can be expected to result in death or which has lasted

8  or can be expected to last for a continuous period of not less than 12

9  months." 42 U.S.C. § 423 (d) (1) (A).

10       The Commissioner has established a five-step sequential evaluation

11 for determining whether a person is disabled.  First, it is determined

12 whether the person is engaged in "substantial gainful activity."  If so,

13 benefits are denied.

14       Second, if the person is not so engaged, it is determined whether

15 the person has a medically severe impairment or combination of

16 impairments.   If the person does not have a severe impairment or

17 combination of impairments, benefits are denied.

18       Third, if the person has a severe impairment, it is determined

19 whether the impairment meets or equals one of a number of "listed

20 impairments." If the impairment meets or equals a "listed impairment,"

21 the person is conclusively presumed to be disabled.

22       Fourth, if the impairment does not meet or equal a "listed

23 impairment," it is determined whether the impairment prevents the person

24 from performing past relevant work.   If the person can perform past

25 relevant work, benefits are denied.

26       Fifth, if the person cannot perform past relevant work, the burden

27 shifts to the Commissioner to show that the person is able to perform

28                                     4

1  other kinds of work.   The person is entitled to benefits only if the

2  person is unable to perform other work.   20 C.F.R. §§ 404.1520, 416.920;

3  <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42 (1987).

4      2.   <u>Issue: ALJ's Evaluation of Consultative Examiner's Findings</u>

5      Although plaintiff did not seek benefits due to diminished

6  intellectual functioning (<u>see</u> TR 142), his challenge here revolves

7  around whether the hypothetical proposed to the VE adequately

8  encompassed the findings and opinions in that regard of psychological

9  consultative examiner Ahmad Rianhinejad, Ph.D.  Plaintiff, who completed

10 the ninth grade and reports that he was an average student in regular

11 classes (TR 198), met with Dr. Rianhinejad one time in February 2006.

12     Plaintiff argues, first, that given Dr. Rianhinejad's assessment of

13 his intellectual functioning, the ALJ had no basis to conclude or

14 include in the VE hypothetical a limitation that he can still perform

15 "simple, routine tasks."

16     Second, he argues the ALJ improperly omitted from the VE

17 hypothetical limitations on pace and persistence opined by Dr.

18 Rianhinejad.

19     Third, plaintiff argues that Dr. Rianhinejad's assessment of his

20 intellectual capacity precludes him from performing the two jobs the VE

21 proposed for him, cashier II and fast-food worker.

22          (a)   <u>Limitation to simple, repetitive tasks</u>

23     Dr. Rianhinejad found that plaintiff has a full-scale IQ score of

24 78 and, consequently, borderline or below-average intellectual

25 functioning.   (TR 191-92.)   Due to this, he opined, plaintiff can

26 understand, remember, and carry out "simple and repetitive instructions"

27 but would have difficulty in understanding, remembering and carrying out

28                                        5

complex and detailed instructions. (TR 192.) In keeping with this, in assessing plaintiff's residual functional capacity ("RFC"), i.e., the most plaintiff can still do despite his limitations,[2] and in the VE hypothetical the ALJ limited plaintiff to "simple, routine tasks." (TR 19, 63.)

Contrary to plaintiff's assertion that the VE must specifically consider a borderline IQ score or the assessment of borderline intellectual capacity, an ALJ is permitted to "translate" a conclusion that plaintiff has borderline intellectual functioning into the "concrete restrictions" set out by the examining psychologist, such as a restriction to only simple work. See Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1174 (9th Cir. 2008) (holding that an assessed RFC for simple, routine, repetitive work captured the assessment of borderline intellectual functioning and any associated limitations on pace). The limitation here to "simple, routine tasks" adequately captured the concrete limitations opined by Dr. Rianhinejad and, therefore, the psychologist's underlying finding of borderline intellectual functioning. Id.; see also Howard v. Massanari, 255 F.3d 577, 583 (8th Cir. 2001) (finding that a hypothetical that described plaintiff as capable of performing "simple work" adequately accounted for finding of borderline intellectual functioning).

Accordingly, Dr. Rianhinejad's report provides substantial evidence to support the ALJ's found limitation to simple, routine tasks, and there is no material legal error here.

---

[2] E.g., Mayes v. Massanari, 276 F.3d 453, 460 (9th Cir. 2001).

6

1              (b)  <u>Pace and persistence</u>

2       Plaintiff suggests that the VE hypothetical was deficient, and the

3 non-disability finding erroneous, for the further reasons that the ALJ

4 did not include Dr. Rianhinejad's purported opined limitations regarding

5 a slow pace and difficulty with persistence.

6       First, the ALJ included the psychologist's pace limitation in the

7 VE hypothetical.  With respect to pace, Dr. Rianhinejad noted that

8 plaintiff has a "slightly slow" pace and he opined that, therefore,

9 plaintiff "may have difficulty in a fast-paced type of work setting."

10 (TR 192.)  The ALJ specifically proposed to the VE a hypothetical person

11 who could work only at a "routine as opposed to production pace."  (TR

12 26.)  Accordingly, the hypothetical included the purportedly omitted

13 limitation and there was no material error in this regard.  See <u>Embrey</u>

14 <u>v. Bowen</u>, 849 F.2d 418, 422 (9th Cir. 1993); <u>see also</u> <u>Stubbs-Danielson</u>

15 <u>v. Astrue</u>, 539 F.3d at 1173-74 (limitation to only simple, repetitive

16 tasks, adequately encompasses pace limitations).

17       Plaintiff's contentions that the VE testified both jobs proposed

18 for plaintiff "have portions of the day when they are fast paced" and

19 that plaintiff's "inordinately slow" pace would render him incapable of

20 working, (Opening Brief at 8), misstate the record.  The VE, in fact,

21 testified that a person capable of working at a routine pace could

22 perform both proposed jobs *despite* the fact that there may be "certain

23 times of the day where it might be busier" because "people tend to go at

24 their own pace.  And it doesn't necessarily mean that they speed up.

25 So, you know, I consider this a rather routine pace."  (TR 66.)

26 Moreover, Dr. Rianhinejad did not find plaintiff to be "inordinately

27 slow" or limit plaintiff to less than a routine pace, as plaintiff

28

suggests, but found him to be "slightly slow" and, accordingly, unable to work at a "fast pace."  (TR 192.)

Second, with respect to the purported persistence limitation, the court observes first that the psychologist-who does not appear to be an expert in pain treatment, did not treat plaintiff's pain, or independently assess plaintiff's pain-opined only that plaintiff's persistence "could" be impacted due to his self-reported pain and suggested that plaintiff see a pain specialist in that regard.  (TR 192.)  The ALJ is not required to adopt opined restrictions that are unsupported by substantial evidence in the record.  Osenbrock v. Apfel, 240 F.3d 1157, 1164-65 (9th Cir. 2001).  The mere suggestion that plaintiff's persistence at work "could" be limited due to his self-reported allegations of pain made in a one-time psychological examination does not constitute substantial evidence.  See Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527 (d) (3) - (6)) (factors that impact the weight given to a physician's opinion include length of treating relationship, frequency of examination, and nature and extent of the treatment relationship, i.e., whether the physician has knowledge about the claimed impairment).

In any event, the ALJ explicitly rejected plaintiff's proffered pain limitation.  (See TR 20-22.)  Notably, plaintiff does not challenge the ALJ's findings that plaintiff's allegations of disabling pain were unsupported by the medical record or that plaintiff is not wholly credible (particularly regarding his allegations of disabling pain), and the court observes that there would be no legitimate basis for him to do

1  so.[3]

2      Accordingly, because the VE hypothetical included a legally

3  sufficient pace limitation and because substantial record evidence does

4  not support a persistence limitation, there is no material legal error

5  here.

6          (c)   Intellectual functioning and jobs

7      Plaintiff suggests, next, that the reasoning component of the

8  General Education Development ("GED") and the General Learning Aptitude

9  ("GLA") requirements of the two jobs proposed for him, as they are

10  defined in U.S. Department of Labor's Dictionary of Occupational Titles,

11  ("DICOT"), (4th ed. 1991), exceed his intellectual capacity.

12     The two jobs proposed were: (1) cashier II (DICOT no. 209.587-014,

13  1991 WL 671840 (G.P.O.)), which the VE testified were available for

14  someone with plaintiff's additional physical limitations to the effect

15  of 4,000 jobs locally and 200,000 nationally; and (2) fast-food worker

16  (DICOT no. 311.472-010, 191 WL 672682 (G.P.O)), of which there are about

17  48,000 jobs locally and more than 2 million nationally.   (TR 27.)

18     The DICOT's GED guidelines are subdivided into three categories—

19

20      [3]  See Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir.
    2001) (in evaluating pain allegations, ALJ may consider lack of
    medical record support for their alleged severity);  Bunnell
21  v.Sullivan, 947 F.2d at 345-46, (in evaluating pain allegations
    ALJ may consider inconsistencies in plaintiff's testimony); Parra
22  v. Astrue, 481 F.3d 742, 750-51 (9th Cir. 2007) (in evaluating
    pain allegations ALJ may consider evidence that plaintiff sought
23  only conservative and not aggressive medical treatment);
    Tommasetti v. Astrue, 533 F.3d 1035, 1040 (9th Cir. 2008) (in
24  evaluating pain allegations the ALJ may discount medical reports
    that are based upon a discredited plaintiff's self reports of
25  pain);  Bayliss v. Barnhart, 427 F.3d 1211, 1216-17 (9th Cir.
    2005) (ALJ properly rejected psychological assessment based on
26  plaintiff's subjective complaints and information submitted by
    third parties but not based on objective medical data or reports
27  plaintiff's subjective complaints).

28

reasoning development, mathematical development, and language development-rated on a scale from 1 (lowest) to 6 (highest). (DICOT, Appendix C, 1991 WL 688702.) The first job proposed for plaintiff, cashier II, requires a reasoning level of 3. This requires an employee to "[a]pply commonsense understanding to carry out instructions furnished in written, oral or diagrammatic form" and to "[d]eal with problems involving several concrete variables in or from standardized situations." (DICOT no. 209.587-014, 1991 WL 671840 (G.P.O.).)

The fast-food worker position proposed for him carries a reasoning development level of 2, which requires an employee to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions" and to "[d]eal with problems involving a few concrete variables in or from standardized situations." (DICOT no. 311.472-010, 191 WL 672682 (G.P.O).)

To the extent plaintiff challenges the ALJ's finding he has the ability to perform the cashier II job, he is correct. A reasoning level of 3 is inconsistent with an intellectual functional capacity limitation to simple, routine work. See, e.g., Hackett v. Barnhart, 395 F.3d 1168, 1176 (10th Cir. 2005) (finding that a limitation to simple and routine work tasks "seems inconsistent with the demands of level-three reasoning"); Estrada v. Barnhart, 417 F.Supp. 2d 1299, 1303-04 (M.D. Fla. 2006) (finding that jobs requiring reasoning level of 3 exceeded plaintiff's limitation to simple interactions and tasks).

To the extent plaintiff challenges the ALJ's findings that he has the ability to perform the fast-food worker position, however, his challenge is without merit. Dr. Rianhinejad's limitation of plaintiff to simple, repetitive tasks is not inconsistent with the ability to

perform jobs with a reasoning level of 2.  <u>See</u>, <u>e.g.</u>, <u>Hackett</u>, 395 F.3d at 1176 (finding level 2 reasoning consistent with an ability to perform "simple and repetitive" tasks); <u>Meissl v. Barnhart</u>, 403 F.Supp.2d 981, 984-85 (C.D. Cal. 2005) (holding plaintiff who could perform "simple tasks . . . at a routine pace" could perform jobs with reasoning level of 2);  <u>Flaherty v. Halter</u>, 182 F.Supp.2d 824, 850-51 (D. Minn. 2001) (finding that ALJ's found limitation to "simple, routine, repetitive, concrete, tangible tasks" did not conflict with DICOT level 2 reasoning).    Therefore,  there  remain  significant  numbers  of  jobs plaintiff can perform in the regional and national economy.

Plaintiff argues, however, that he cannot perform the fast food worker job for the additional reason that an individual with borderline intellectual functioning falls within the bottom 10% of intellectual functioning compared with the population as a whole, and the job requires a level 4 GLA, which is defined as requiring a degree of aptitude  ability  which  excludes  the  bottom  10%  of  the  working population.  (<u>See</u> DICOT no. 311.472-010, 191 WL 672682 (G.P.O).)   The court, again, disagrees.

First, a finding of borderline intellectual functioning does not correlate  directly  with  the  DOT's  GLA  definitions.    <u>See</u> <u>Stubbs-Danielson</u>, 539 F.3d at 1176 (<u>citing</u> DICOT §§ 713.687-018, 734.687-018, 521.687-086) (finding  that  several  occupations  were  available  to  a plaintiff assessed with borderline intellectual functioning, all of which required a level 4 GLA.)  Plaintiff offers no authority for the proposition that they do so. Moreover, nothing in the DOT suggests that a Level 4 GLA excludes those within the bottom 10% of intellectual functioning, let alone the bottom 10% of the intellectual functioning of

the general population.  Rather, the DOT refers to "aptitude ability." (See DICOT no. 311.472-010, 191 WL 672682 (G.P.O).)

Second, the evidence in the record reasonably supports a conclusion that plaintiff had the aptitude to perform the jobs identified by the VE.  Dr. Rianhinejad noted that plaintiff is a reliable historian, (TR 188), that his thoughts were organized and that he had a fair immediate memory, fair concentration, fair attention span, and fair judgment, (TR 190).  He opined that plaintiff is able to understand, remember and carry out short, simple instructions, and retains the ability to manage his own funds and to follow instructions from an employer.  (TR 192.) The fast-food worker job identified by the VE does not call for a greater ability to reason or make judgments.

Thus, substantial evidence supports the ALJ's Step Five determination that plaintiff can perform a significant number of jobs in the regional or national economy and there is no material legal error here.

## CONCLUSION

If the evidence can reasonably support either affirming or reversing the Commissioner's conclusion, the court may not substitute its judgment for that of the Commissioner.  Flaten v. Sec'y of Health and Human Servs., 44 F.3d at 1457.

After careful consideration of the record as a whole, the magistrate judge concludes that the Commissioner's decision is supported by substantial evidence and is free from material legal error.

//

//

//

12

Accordingly, it is ordered that judgment be entered in favor of the Commissioner.

DATED: 6/16/09

_____
CAROLYN TURCHIN
UNITED STATES MAGISTRATE JUDGE

13

**SOCIAL SECURITY ADMINISTRATION**
**Office of Disability Adjudication and Review**

**DECISION**

| IN THE CASE OF | CLAIM FOR |
|---|---|
| | Period of Disability, Disability Insurance Benefits, and Supplemental Security Income |
| Ernesto Ariola | |
| (Claimant) | |
| (Wage Earner) | (Social Security Number) |

This case is before the Administrative Law Judge pursuant to a request for hearing.

**JURISDICTION AND PROCEDURAL HISTORY**

On October 27, 2005, the claimant filed a Title II application for a period of disability and disability insurance benefits. The claimant also filed a Title XVI application for supplemental security income on October 27, 2005. In both applications, the claimant alleged disability beginning November 19, 2004, due to back pain, bursitis, arthritis, heart problems, and diabetes. (Exhibits 1D, 2D, 2E). The claims were denied initially on April 17, 2006, and upon reconsideration on December 27, 2006. (Exhibits 1B-5B). Thereafter, the claimant filed a timely written request for hearing on January 11, 2007 (20 CFR 404.929 *et seq.* and 416.1429 *et seq.*) (Exhibit 6B). The claimant appeared and testified at a hearing held on November 16, 2007, in Los Angeles, CA. Lynne Tracy, an impartial vocational expert, also appeared at the hearing. The claimant is represented by Susan R. Wasserman, an attorney.

Following the hearing, the record was left open for 30 days for the claimant to *submit additional* medical evidence. Thereafter, the claimant submitted additional records from Kaiser Permanente Hospital on or about December 7, 2007, which were added to the record as Exhibit 8F. Thereafter, the record was closed.

**ISSUES**

The issue is whether the claimant is disabled under sections 216(i), 223(d) and 1614(a)(3)(A) of the Social Security Act. Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

With respect to the claim for a period of disability and disability insurance benefits, there is an additional issue whether the insured status requirements of sections 216(i) and 223 of the Social Security Act are met. **The claimant's earnings record shows that the claimant has acquired sufficient quarters of coverage to remain insured through December 31, 2005. Thus, the**

See Next Page

**13**



Ernesto Ariola                                     Page 2 of 12

**claimant must establish disability on or before that date in order to be entitled to a period of disability and disability insurance benefits.**

After careful consideration of all the evidence, the undersigned Administrative Law Judge concludes the claimant has not been under a disability within the meaning of the Social Security Act from November 19, 2004 through the date of this decision.

## APPLICABLE LAW

Under the authority of the Social Security Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled (20 CFR 404.1520(a) and 416.920(a)). The steps are followed in order. If it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not go on to the next step.

At step one, the undersigned must determine whether the claimant is engaging in substantial gainful activity (20 CFR 404.1520(b) and 416.920(b)). Substantial gainful activity (SGA) is defined as work activity that is both substantial and gainful. "Substantial work activity" is work activity that involves doing significant physical or mental activities (20 CFR 404.1572(a) and 416.972(a)). "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized (20 CFR 404.1572(b) and 416.972(b)). Generally, if an individual has earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that he has demonstrated the ability to engage in SGA (20 CFR 404.1574, 404.1575, 416.974, and 416.975). If an individual engages in SGA, he is not disabled regardless of how severe his physical or mental impairments are and regardless of his age, education, and work experience. If the individual is not engaging in SGA, the analysis proceeds to the second step.

At step two, the undersigned must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe" (20 CFR 404.1520(c) and 416.920(c)). An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work (20 CFR 404.1521 and 416.921; Social Security Rulings (SSRs) 85-28, 96-3p, and 96-4p). If the claimant does not have a severe medically determinable impairment or combination of impairments, he is not disabled. If the claimant has a severe impairment or combination of impairments, the analysis proceeds to the third step.

At step three, the undersigned must determine whether the claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926). If the claimant's impairment or combination of impairments meets or medically equals the criteria of a listing and meets the duration requirement (20 CFR 404.1509 and 416.909), the claimant is disabled. If it does not, the analysis proceeds to the next step.



Ernesto Ariola █████████                                     Page 3 of 12

Before considering step four of the sequential evaluation process, the undersigned must first determine the claimant's residual functional capacity (20 CFR 404.1520(e) and 416.920(e)). An individual's residual functional capacity is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. In making this finding, the undersigned must consider all of the claimant's impairments, including impairments that are not severe (20 CFR 404.1520(e), 404.1545, 416.920(e), and 416.945; SSR 96-8p).

Next, the undersigned must determine at step four whether the claimant has the residual functional capacity to perform the requirements of his past relevant work (20 CFR 404.1520(f) and 416.920(f)). The term past relevant work means work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last 15 years or 15 years prior to the date that disability must be established. In addition, the work must have lasted long enough for the claimant to learn to do the job and have been SGA (20 CFR 404.1560(b), 404.1565, 416.960(b), and 416.965). If the claimant has the residual functional capacity to do his past relevant work, the claimant is not disabled. If the claimant is unable to do any past relevant work or does not have any past relevant work, the analysis proceeds to the fifth and last step.

At the last step of the sequential evaluation process (20 CFR 404.1520(g) and 416.920(g)), the undersigned must determine whether the claimant is able to do any other work considering his residual functional capacity, age, education, and work experience. If the claimant is able to do other work, he is not disabled. If the claimant is not able to do other work and meets the duration requirement, he is disabled. Although the claimant generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Social Security Administration. In order to support a finding that an individual is not disabled at this step, the Social Security Administration is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do, given the residual functional capacity, age, education, and work experience (20 CFR 404.1512(g), 404.1560(c), 416.912(g) and 416.960(c)).

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

After careful consideration of the entire record, the undersigned makes the following findings:

**1.   The claimant met the insured status requirements of the Social Security Act through December 31, 2005.**

**2.   The claimant has not engaged in substantial gainful activity since November 19, 2004, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq*., 416.920(b) and 416.971 *et seq*.).**

The claimant has reported past relevant work activity as a machinist (1993-1996) and drapery/blinds installer (2001-2004). (Exhibit 6E, 4D). There is no evidence the claimant has engaged in substantial gainful activity since his alleged onset date.

See Next Page                                                    **15**



Ernesto Ariola <span style="background:black">████████</span>                                          Page 4 of 12

**3. The claimant has the following severe impairments: lumbar spine degenerative disc disease; sciatica.; acute coronary syndrome.; and borderline intellectual functioning (20 CFR 404.1520(c) and 416.920(c)).**

The available medical evidence establishes that the claimant treated intermittently between 2003 and 2007 at Kaiser Permanente Hospital of Baldwin Park, CA.

An April 2003 ECG yielded somewhat abnormal results but showed the claimant to have a normal cardiac sinus rhythm.

In April 2004, the claimant presented to the emergency room with complaints of chest pain and back pain. However, an ECG was effectively unchanged from the earlier one and the claimant displayed no heart or lung irregularities upon examination, and had no pain, neurological deficits, and generally no observable physical problems. The claimant was discharged without any treatment.

Subsequently, the claimant returned to the emergency room in November 2004 with complaints of recent onset chest pressure not associated with shortness of breath of pain. The claimant reported similar symptoms in association with a methamphetamine-induced 1999 heart attack. Upon examination, the claimant's initially elevated blood pressure subsided, he showed no neurological deficits, but he did display some right L4-S1 sciatic numbness and positive straight leg raising. EKG tests were largely normal. The claimant was diagnosed with diabetes, acute coronary syndrome and recurrent sciatica, and prescribed appropriate medication and discharged.

The claimant did not apparently return to the hospital until January 2005, at which time he presented with complaints of recent onset right leg pain. A January 2005 lumbar spine a lumbar spine x-ray showed some degenerative changes at the L5-S1 level indicative of lumbar spondylosis. (Exhibit 6F:134). Also, a January 2005 lumbar spine CT scan reportedly showed moderate spinal canal stenosis and neural foraminal narrowing at the L4-5 and L5-S1 levels and mild stenosis at the L2-3 and L3-4 levels. The claimant was prescribed appropriate pain medication and, as of an April 2005 report, was noted to be doing "fairly okay on his pain medication." (Exhibit 6F:22).

Thereafter, the claimant complained of recent onset right shoulder pain in August 2005. The claimant displayed diminished range of motion and pain with movement and a right shoulder x-ray showed degenerative arthritis and osteophyte formation but no misalignment or fracture. As such, the claimant was diagnosed with bursitis. (Exhibit 6F:15, 16, 133). Also, as of August 2005, the claimant was noted to have normal heart and lung sounds and had general low back tenderness but no specific point tenderness. Moreover, the claimant's diabetes was noted to be uncontrolled primarily due to poor medication compliance insofar as the claimant had failed to refill his medication since January 2005. (Exhibit 6F:12).

As of October 2005, the claimant continued to complain of back pain but there is no indication he required or underwent any particular treatment. (Exhibit 6F).



Ernesto Ariola███████████                                    Page 5 of 12

Subsequently, in connection with the claimant's Social Security applications, he attended a consultative medical evaluation in February 2006 with John Sedgh, M.D. The claimant presented with complaints of non-insulin dependent diabetes associated with thirst, frequent urination, and numbness and tingling in his feet, low back pain radiating to his legs and occasional chest pain. The claimant reported occasionally using a cane to walk. Upon examination, the claimant displayed normal blood pressure, equal grip strength, normal heart and lung sounds, a full range of neck motion without spasm or tenderness, a decreased range of lumbar spine motion with some positive straight leg raising in the seated position but without spasm or tenderness, a full range of motion in his upper and lower extremities, normal vision, and normal neurological functioning with no deficits of motor strength, sensation, or reflexes. The claimant's gait was noted to be "slightly antalgic." An updated ECG test was largely normal and updated lumbar spine x-rays again showed no more than some degenerative changes. As such, Dr. Sedgh diagnosed the claimant with diabetes (without sensory deficits), low back arthritis, and likely non-cardiac origin chest pain. Dr. Sedgh further assessed the claimant as able to lift/carry 10-20 lbs., sit, stand and/or walk up to 6 hours per 8-hour workday, and perform no more than occasional movements. (Exhibit 2F).

Based on a review of the available medical evidence to date as of March 2006, the State Disability Determination Service non-examining medical sources diagnosed the claimant with the same impairments found by Dr. Sedgh and effectively assessed the claimant with the same functional limitations as he found. (Exhibit 5F).

Thereafter, the claimant continued to treat at Kaiser Permanente intermittently.  In June 2006 underwent removal of a small pellet which had been in right arm for some time. There is no evidence of any residual complications from the procedure. (Exhibit 8F).

In July 2006, an eye exam was normal and the claimant retained 20/20 vision. A follow-up eye exam in October 2006 showed no signs of diabetic retinopathy. (Exhibit 6F, 8F).

In March 2007, the claimant returned to the hospital with chest pain complaints associated with palpitations and lightheadedness. Upon examination, he retained normal blood pressure, normal heart and lung sounds, normal neurological functioning, and a normal ECG. The claimant also underwent a cardiac stress test, which yielded normal results. (Exhibit 8F:53). The claimant was discharged with medication for his diabetes, dietary restrictions, and ability to engage in activity as tolerated. (Exhibit 8F:38). The claimant returned again in August 2007 with similar chest pain complaints and, again, upon examination showed no identifiable cardiac abnormalities. In October 2007, the claimant presented to the hospital with complaints of numbness and tingling in his fingers. Again, no particular abnormalities were noted upon examination and the claimant was again noted to be non-compliant with his medications and diet. (Exhibit 8F).

The undersigned notes that the claimant did not allege any psychiatric impairments in his initial filing paperwork nor did he cite any psychiatric problems at the hearing. Nevertheless, the claimant attended a consultative psychological evaluation in February 2006 with Ahmad Riahinejad, Ph.D. Again, the claimant did not report any psychological problems or treatment and denied any substance abuse within the previous 4 years. The claimant reported needing assistance with walking and household chores but noted that he is capable of cooking, shopping,



Ernesto Ariola (⬛⬛⬛⬛⬛)                                        Page 6 of 12

dressing, and self care. The claimant generally performed well upon examination, retaining a cooperative attitude, normal cognitive functioning but with borderline intelligence, and intact memory, concentration, fund of knowledge and insight. As a result, Dr. Riahinejad diagnosed the claimant with polysubstance abuse, in remission, and borderline intellectual functioning. As such, Dr. Riahinejad assessed the claimant as capable of understanding, remembering and carrying out simple, repetitive instructions, interact appropriately with supervisors and coworkers and function effectively in a less-than-fast paced work environment. (Exhibit 1F).

Therefore, the medical evidence establishes that the claimant has the medically determined impairments of lumbar spine degenerative disc disease; sciatica; acute coronary syndrome.; and borderline intellectual functioning which are considered severe under the Social Security Regulations since they have more than a minimal impact on his capacity to perform basic work functions (20 CFR 404.1521 and 416.921).

At the hearing, the claimant testified that he considers himself disabled due, in part, to diabetes. However, he did not cite any diabetes-related problems and attributed numbness in his hands to arthritis. Although he testified that he has left eye problems due to diabetes, this is not borne out by any of the medical evidence. The claimant also did not mention diabetes as a contributing problem in Exhibit 3 (pain questionnaire). The undersigned notes that the claimant's diabetes is non-insulin dependent and none of the medical records reflect any diabetes-related end organ damage, retinopathy or neuropathy. The claimant's condition appears well controlled with diet and proper medication and any problems stemming from his diabetes appear to be self-inflicted. For instance, as noted above, as of August 2005, the claimant's diabetes was noted to be uncontrolled primarily due to poor medication compliance insofar as the claimant had failed to refill his medication since January 2005. (Exhibit 6F:12).

The Social Security Regulations state that "an impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities." (20 CFR 404.1521(a); 416.921(a)). The undersigned finds the claimant has no more than, at most, a slight diabetes-related impairment which medical evidence establishes as having no more than, at most, a minimal effect on his ability to perform basic work-related activities. Therefore, the claimant does not have a severe impairment related to his diabetes. (Social Security Ruling 85-28, 20 CFR 416.921 and 404.1521).

**4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). Specifically, the claimant's back impairment has not resulted in the requisite loss of neurological functioning to meet or equal Medical Listing 1.04.**

**5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work[1] not involving more**

---

[1] Social Security Ruling 83-10 states, in relevant part:

    Light work.  The regulations define light work as lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted in a particular light



Ernesto Ariola 

**than occasional crouching, stooping or other postural movements or more than simple, routine tasks.**

In making this finding, the undersigned considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p. The undersigned also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

In considering the claimant's symptoms, the undersigned must follow a two step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to do basic work activities. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must make a finding on the credibility of the statements based on a consideration of the entire case record.

Because a claimant's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 CFR 404.1529(c) and 416.929(c) describe the kinds of evidence, including the factors below, that the undersigned must consider in addition to the objective medical evidence when assessing the credibility of the claimant's statements:

    1. The claimant's daily activities;

---

job may be very little, a job is in this category when it requires a good deal of walking or standing -- the primary difference between sedentary and most light jobs. A job is also in this category when it involves sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls, which require greater exertion than in sedentary work; e.g., mattress sewing machine operator, motor-grader operator, and road-roller operator (skilled and semiskilled jobs in these particular instances). Relatively few unskilled light jobs are performed in a seated position.

"Frequent" means occurring from one-third to two-thirds of the time. Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time. The lifting requirement for the majority of light jobs can be accomplished with occasional, rather than frequent, stooping. Many unskilled light jobs are performed primarily in one location, with the ability to stand being more critical than the ability to walk. They require use of arms and hands to grasp and to hold and turn objects, and they generally do not require use of the fingers for fine activities to the extent required in much sedentary work.



Ernesto Ariola                                     Page 8 of 12

2. The location, duration, frequency, and intensity of the claimant's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the claimant uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms (SSR 96-7p).

At the hearing, the claimant testified that he considers himself unable to work due to back and cardiac pain. The claimant stated that his back pain stems from a motor vehicle accident from several years earlier and his pain radiates to his legs causing numbness, tingling and need for a cane to ambulate. He testified he is unable to walk an entire city block, stand for more than 20-25 minutes, or sit for longer than 20 minutes. He added that he must use a recliner chair at home for up to 1 hour, gets poor sleep due to pain, and has arthritis in his hands causing difficulty with gripping and carrying. The claimant reported no problems with dressing and bathing but needs someone around when showering due to instances of falling. He added that he has been unable to drive for 3-4 years due to a suspended license. He added that he takes various pain medications which provide some relief. As for his cardiac pain, the claimant testified that he experiences cardiac pain episodes about 1-2 times per month and carries nitroglycerin with him.

In Exhibit 5E, the claimant reported disability due to back pain, inability to sit or stand for more than 10-15 minutes, walk without pain, and forgetfulness. In Exhibit 3E, the claimant reported constant back pain radiating to his legs and, contrary to his hearing testimony, denied getting any relief from pain medication despite taking reportedly strong medication (i.e. morphine). Also, contrary to what he told Dr. Riahinejad regarding his daily activities, the claimant reported in Exhibit 3E that that "I do nothing. My wife handles everything." He denied being able to run any errands, perform any household chores, dress himself with out assistance, walk more than 10 ft., or sit for more than 5 minutes.

After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.

First, regarding the claimant's back pain, the undersigned notes that nothing in the medical evidence supports the degree of pain and disability alleged. Although the claimant has been

See Next Page                                                          **20**



Ernesto Ariola  Page 9 of 12

diagnosed with lumbar spine degenerative changes, diagnostic tests have shown moderate spinal canal stenosis and neural foraminal narrowing at the L4-5 and L5-S1 levels and mild stenosis at the L2-3 and L3-4 levels, and the claimant has displayed some positive straight leg raising indicative of radicular pain, the degree of pain and reported disability has not been noted in the medical records. During Dr. Sedgh's evaluation, the claimant retained normal neurological functioning with no deficits of motor strength, sensation, or reflexes and his gait was only noted to be "slightly antalgic." As such, Dr. Sedgh did not assess the claimant with any particular limitations in his ability to sit, walk or stand.

No treating or examining source has observed the claimant to have the degree of limited mobility he alleges, nor has any medical source assessed the claimant with functional limitations such as those he alleges. There is no indication he has ever been referred to or participated in ongoing physical therapy, pain management, etc. for his reported pain or that any treating or examining source has prescribed the use of a cane or other walking device. Also, despite the claimant's assertions that pain medications are largely useless, this contradicts his statements in the record such as the above-cited reference from April 2005 where the claimant reported doing "fairly okay on his pain medication." (Exhibit 6F:22).

The same holds true of the claimant's reported chest pain. As noted above, the claimant only reported his chest pain as intermittent and not precipitated by any particular activity. Although the claimant reported experienced a prior heart attack, various cardiac tests since his alleged onset date have shown no particular abnormalities

As noted above, as of March 2007, the claimant retained normal blood pressure, normal heart and lung sounds, normal neurological functioning, and a normal ECG. The claimant also underwent a cardiac stress test, which yielded normal results. (Exhibit 8F:53). As of August 2007, the claimant again complained of chest pains but, upon examination showed no identifiable cardiac abnormalities. (Exhibit 8F). In fact, Dr. Sedgh considered the claimant's chest pains to likely be non-cardiac in origin and the claimant has not offered any specific assertions as to how his reported chest pain interferes with his ability to work or perform daily living activities. Again, no treating or examining source has recommended any particular treatment for the claimant's reported heart condition and, following his March 2007 hospital visit he was discharged with approval to engage in activity as tolerated. (Exhibit 8F:38).

There is no medical support for the claimant's allegations of restrictive arthritis in his hands and, although he has not alleged any particular mental dysfunction impeding his ability to work, the undersigned notes that the claimant has been found to have borderline intellectual functioning limiting him to simple work.

Regarding the claimant's daily activities, as noted above, he has given widely varying accounts of his ability to perform such activities. The claimant has given inconsistent statements regarding his functional ability to the consultative examiners, at the hearing and in his written disability reports. The claimant's inconsistent statements coupled with the lack of medical support for the severe degree of disability he alleges further detracts from his credibility.

See Next Page **21**



Ernesto Ariola ███████████                                    Page 10 of 12

At the hearing, the claimant's thoughts did not seem to wander and all questions were answered alertly and appropriately. There is no credible evidence of strong medication to alleviate pain that would significantly impair the claimant's ability to do basic work activities. Although the claimant reports being prescribed Fentanyl, a strong pain reliever, there is no reported evidence in the medical record of any significant side effects. Also, as noted above, there is no evidence that the claimant is incapable of performing daily living activities despite his inconsistent statements to the contrary. Thus, although the claimant does have medically determined medical impairments which could be expected to produce some pain, the intensity and persistence of the pain alleged by the claimant appears exaggerated. Because the claimant's allegations of disability due to pain are based primarily on subjective symptoms, his credibility is a material factor and the repeated inconsistencies and contradictions in the evidence as well as the general lack of medical support for his allegations, lead the undersigned to conclude that the claimant is not wholly credible.

Therefore, based on a thorough analysis of all the evidence including an analysis of the claimant's pain symptoms under the Regulations, the undersigned finds that the claimant has a residual functional capacity to perform light work not involving more than occasional crouching, stooping or other postural movements or more than simple, routine tasks.

**6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).**

In determining the claimant's ability to perform her past relevant work, the testimony of the vocational expert, Lynne Tracy, was taken. The vocational expert testified that the claimant's past relevant work as a machine operator and blinds installer/drapery hanger were both classified by the <u>Dictionary of Occupational Titles</u> (DOT) as semi-skilled to skilled and required "medium" work activity (although, as actually performed by the claimant per his description, the jobs required light to medium work activity). Based on the claimant's residual functional capacity and the testimony of the vocational expert that the claimant could not return to either of his past jobs given his current limitations, the undersigned finds that the claimant is unable to perform his past relevant work. Once the claimant has established that he cannot perform his past relevant work because of his impairments, the burden shifts to the Commissioner to establish that there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with his functional limitations, age, education and work experience.

**7.   The claimant was born on November 23, 1960 and was 43 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).**

**8.   The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).**

**9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).**

See Next Page                                                                                 **22**



Ernesto Ariola  Page 11 of 12

**10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).**

In determining whether a successful adjustment to other work can be made, the undersigned must consider the claimant's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2. If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile (SSR 83-11). When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules are used as a framework for decisionmaking unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or nonexertional limitations (SSRs 83-12 and 83-14). If the claimant has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decisionmaking (SSR 85-15).

If the claimant had the residual functional capacity to perform the full range of light work, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.18. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled light occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity, as cited above. The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as: (1) cashier II (DOT No. 211.462-010; light/unskilled work activity – 20,000 jobs existing in the greater Los Angeles County area/300,000-400,000 jobs existing in the national economy) and; (2) fast food worker (DOT No. 311.472-010; light/unskilled work activity – 48,000 jobs existing in the greater Los Angeles County area/2,000,000 jobs existing in the national economy).

In accordance with Johnson v. Shalala, 60 F3d 1428 (9th Cir. 1995), the undersigned accepts the testimony of the vocational expert regarding the claimant's ability to perform the jobs mentioned, given his specific limitations. Pursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant has been capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

**11. The claimant has not been under a disability, as defined in the Social Security Act, from November 19, 2004 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).**

See Next Page

**23**



Ernesto Ariola ()                                          Page 12 of 12

## **DECISION**

Based on the application for a period of disability and disability insurance benefits filed on October 27, 2005, the claimant is not disabled under sections 216(i) and 223(d) of the Social Security Act.

Based on the application for supplemental security income filed on October 27, 2005, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

_Sally C Reason_
Sally C Reason
Administrative Law Judge

FEB 1 1 2008
Date

**24**

